# CIRCUIT COURT OF FAIRFAX COUNTY

Nester Cordova,
Administrator of the
Estate of Julieta Cordova,
deceased

   v.

Carl Alper et al.

Case No. (Law) 127502

Carl Alper

   v.

Nester Cordova,
Administrator of the
Estate of Julieta Cordova,
deceased

Case No. (Chancery) 172027

February 24, 2004

BY JUDGE STANLEY P. KLEIN

These matters are before the court on the pleadings filed on behalf of Carl Alper seeking relief from the default judgment previously entered in favor of Nester Cordova, Administrator of the Estate of Julieta Cordova, Deceased ("Cordova"), against Alper in Law Number 127502 ("The Law Case"). In The Law Case, Alper claims, *inter alia*, that the judgment rendered against him must be set aside as void because (1) process was not served on him within one year of the filing of the case as required by Virginia law; (2) there was no basis for this court to exercise *in personam* jurisdiction over him; (3) the purported service of process on him through the Secretary of the Commonwealth was not valid; and (4) he was mentally incapacitated at the time of the relevant proceedings in The Law Case and the court failed to appoint a guardian ad litem to protect his interests. In Chancery Number 172027 ("The Chancery Case"), Alper claims he is entitled to relief from the effects of the default judgment in The Law Case pursuant to Va. Code § 8.01-428(D).

Cordova responds (1) that Alper's claims should be precluded based upon principles of *res judicata*, judicial estoppel, equitable estoppel, and laches; (2) that this court has already ruled that process was timely served; (3) that this court properly exercised *in personam* jurisdiction over Alper; (4) that process was properly served on Alper through the Secretary of the Commonwealth; (5) that the evidence is insufficient to establish that Alper was mentally incapacitated during the relevant times and that, even if he were, any such incapacity would, at best, render the underlying judgment voidable, not void; and (6) that Alper has failed to meet his burden of proof to establish any basis for relief under Va. Code § 8.01-428.

After full consideration of the evidence and arguments presented and all of the applicable authorities, the court sets aside the default judgment in The Law Case and denies the relief sought in The Chancery Case solely because Alper has an adequate remedy at law.

## I. *Background*

Except as otherwise noted in this letter opinion, the court finds the facts set out in this Background section to have been established by credible evidence at the trial of these matters.

### A. *The Underlying Cause of Action and the Relevant Judicial Proceedings*

In the Fall of 1989, Julieta Cordova ("Mrs. Cordova") was under the care of her OB/GYN Dr. Chun Lee in Fairfax, Virginia. On or about September 23, 1989, Dr. Lee took a cervical pap smear from Mrs. Cordova and forwarded a slide containing it to a laboratory in Exton, Pennsylvania, known as Physicians Clinical Services ("PCS"). See Cordova Exhibit # 1 and Motion for Judgment in The Law Case. In this opinion, the court will hereinafter refer to Alper's exhibits as Plaintiff's exhibits and Cordova's exhibits as Defendant's exhibits. On October 24, 1989, PCS issued a report stating that the pap smear was "negative for malignancy." See Defendant's Exhibit # 1. An additional pap smear for Mrs. Cordova was forwarded to PCS in December of 1989, and this time the slide was found "positive for malignancy." See Defendant's Exhibit # 3. Mrs. Cordova, who was then pregnant, was diagnosed with grade one cervical adenocarcinoma. She subsequently declined some prescribed treatment because she elected to attempt to carry the baby to term. Unfortunately, Mrs. Cordova died from cancer of the cervix on January 22, 1991. See Plaintiff's Exhibit # 41, par. 6.

Dr. Lee did not know Alper, and Alper's relationship with PCS was not relevant to Dr. Lee's decision to send Mrs. Cordova's slides to PCS; nor did Alper play any role in the analysis of Mrs. Cordova's slides. As PCS did not analyze pap smears, it forwarded Mrs. Cordova's slides to Fern Rosen at Albert Einstein Medical Center in Philadelphia. The analyses of the relevant slides were performed at Albert Einstein, and the results were forwarded to PCS. Personnel at PCS prepared reports on PCS's stationery, reflecting the findings of the people at Albert Einstein and forwarded those reports to Dr. Lee. The designation "Carl Alper, Ph. D./ John F. Crawford/Ph. D. Laboratory Director" was preprinted on all of PCS's reports during this time frame. The report relating the positive pap smear also noted that it was "Reviewed by Dr. Levy, Pathologist." See Defendant's Exhibit # 3. Neither Fern Rosen nor Dr. Levy were then employees of PCS.

Some time in December of 1990, slides purporting to be Mrs. Cordova's were put through the door slot in Dr. Lee's office. Dr. Lee had not contacted PCS to have the slides returned to him and, at the time of the hearing herein, did not know whether Mrs. Cordova's other treating physician, Dr. Krebs,

had requested the slides, which came in a bag from PCS addressed to Dr. Krebs. Dr. Lee examined the slides and determined that the handwriting on the slides was not his nurse's writing, nor were the slides the type of slides then utilized in his office. As a result, Dr. Lee concluded that these slides were not Mrs. Cordova's slides that he had previously forwarded to PCS. Dr. Lee testified that he attempted to obtain his original slides but was never successful. In the Motion for Judgment in The Law Case, Cordova alleged, upon information and belief, that agents and employees of PCS, including Alper and John Crawford, had "knowingly substituted slides obtained from a healthy, normal individual and deliberately misidentified them in an effort to hide the fact that the agents or employees of [PCS] had misdiagnosed the smears ... in an effort to defraud the plaintiff." Motion for Judgment, par. 13. This allegation is the cornerstone of Cordova's claim of fraud in The Law Case.

At the hearing on Alper's motions, John Crawford testified that he had been the Laboratory Director of PCS from the time it began operations until 1991. According to Crawford's credible testimony,[1] Alper had been brought on board by Jim Flore[2] solely as "window dressing" because of Alper's reputation as a respected clinical chemist. Crawford met Alper on only a couple of occasions; once at medical school in Pennsylvania and once when the lab facilities were being constructed in Exton, Pennsylvania. Alper had nothing to do with PCS's operation, and he was never present in the lab after it was operational. In fact, he did not even have the ID badge necessary to gain entry to the facility. According to Crawford, Alper had nothing to do with the analysis or handling of Mrs. Cordova's slides.

On July 31, 1992, Cordova filed a wrongful death medical malpractice action against Dr. Lee seeking damages of one million dollars, the then existing cap on medical malpractice damages pursuant to Va. Code § 8.01-581.15. On or about October 29, 1992, Robert L. Ellis, counsel for Dr. Lee, sent a letter[3] to Thomas P. Mains, counsel for Cordova, advising Mains that the slides received from PCS, which purported to be those of Mrs. Cordova, were not her slides. Eventually, Cordova settled the lawsuit against Dr. Lee.

On October 17, 1993, over four years after the alleged misreading of the September 1989 slide, Mains, a very experienced malpractice attorney, filed The Law Case in this court on behalf of Cordova. In a one count motion for judgment against Physicians Clinical Services, Alper, and Crawford alleging

---

[1] This court found Crawford's testimony credible notwithstanding the contents of the report contained in Defendant's Exhibit # 12, which listed Alper as a lab director.

[2] Flore was the President of Physician's Clinical Services, Ltd., the General Partner of Physicians Clinical Services Limited Partnership which ran PCS during Crawford's tenure with it.

[3] See Plaintiff's Exhibit # 42.

both negligence and fraud, Cordova prayed for damages in the amount of two million dollars, in excess of the then existing statutory cap for medical malpractice actions. No further action was taken in The Law Case until the court issued a Rule to Show Cause on October 6, 1994, returnable to December 9, 1994, as a result of Cordova's failure to attempt to serve any of the defendants with process.

Thereafter, on October 18, 1994, Mains forwarded a request to the Clerk of the Court to serve Alper and Crawford through the Secretary of the Commonwealth. See Plaintiff's Exhibit # 32. Mains's cover letter noted that "Physician's Clinical Services no longer exists as an entity" and service on that defendant was not sought. The affidavit for service on the Secretary of the Commonwealth, executed by Mains on October 18, 1994, averred that both Alper and Crawford were non-residents and had a last know address of 825 Springdale Drive, Exton, Pennsylvania 19341. See Plaintiff's Exhibit # 33. Although the instructions on the form affidavit required the plaintiff to insert the appropriate subsection number of § 8.01-328.1 if non-residence of the defendants was claimed, no such designation was made on the form.

On November 18, 1994, the Secretary of the Commonwealth filed certificates of compliance with the Clerk of the Court noting mailings to both Alper and Crawford. See Supreme Court Record, pp. 10-13. On December 6, 1994, the Secretary filed with the Clerk additional copies of certificates of compliance, along with copies of the motion for judgment. See Supreme Court Record, pp. 15-29. These copies may well be the copies that the Secretary mailed to Alper and Crawford. The court file reflects that Notices of Status Conference to Alper and Crawford that were mailed by the Clerk of the Court in early January 1995 were returned by the United States Post Office as "Return to Sender – Moved, Left No Address." See multiple copies of each notice in Supreme Court Record, pp. 32-36, and the return envelopes (located on bottom left hand portion of this court's file in The Law Case). On December 9, 1994, Judge Michael P. McWeeny entered an *ex parte* order dismissing the October 6, 1994, Rule to Show Cause, finding that "service was obtained and due diligence shown." See Defendant's Exhibit # 49. Thereafter, Mains filed a Motion for Default Judgment on December 30, 1994, that was originally noticed for hearing on January 6, 1995, and eventually was presented on February 6, 1995. In support of the motion, Mains submitted an affidavit, dated January 16, 1995, which, *inter alia*, averred that Alper "was an agent ... of Defendant, Physicians Clinical Services, at all times relevant to the allegations ... and upon information and belief, remains so to this date, and is not a member of the Armed Forces." See Supreme Court Record, pp. 38-39. On February 6, 1995, Judge Arthur B. Vieregg entered a judgment against Alper and Crawford as to liability but

continued the case for presentation of proof of damages.

No further action was taken by Cordova in The Law Case for approximately fourteen months, after which, efforts were undertaken to schedule a date for a hearing on damages. Thereafter, on June 7, 1996, evidence was presented to Judge F. Bruce Bach, who granted a judgment for two million dollars on behalf of Cordova against Alper and Crawford. Upon motion of Cordova, The Law Case was nonsuited as to the claim against Physicians Clinical Services. Judge Bach entered a Final Judgment Order reflecting his rulings on August 12, 1996. See Plaintiff's Exhibit # 37.

On December 16, 1997, Crawford filed a Motion to Set Aside Judgment against Defendant John F. Crawford. An evidentiary hearing was held on the motion on March 12, 1998. On April 17, 1998, Judge Bach issued a letter opinion. See Supreme Court Record, pp. 106-08. In his opinion, Judge Bach made clear that he had granted the underlying judgment based upon "the fraud claim." See Supreme Court Record, p. 106. He further ruled that there was no basis for Virginia to have exercised *in personam* jurisdiction over Crawford under Virginia's long-arm statute, Va. Code § 8.01-328.1. As a result, he granted the motion and entered an order setting aside the judgment against Crawford on April 18, 1998. Cordova timely noted an appeal of Judge Bach's April 8, 1998, order. By an unpublished order entered March 23, 1999, the Supreme Court of Virginia affirmed Judge Bach's ruling, reasoning, in part, that "a finding of *in personam* jurisdiction in this case would require the appellee to defend himself in the courts of this Commonwealth simply because his type-written name appeared on three documents that were mailed to Virginia."

On April 19, 2001, counsel for Alper filed The Chancery Case in this court seeking relief pursuant to Va. Code § 8.01-428(D). On July 2, 2002, counsel for Alper filed a Motion to Set aside Default Judgment in The Law Case. By order entered August 16, 2002, these matters were consolidated for trial. A three-day hearing was conducted on March 3-5, 2003, after which the court took the matter under advisement. Various post-trial memoranda have been filed by the parties and considered by the court.

B. *Cordova's Efforts to Provide Alper with Notice of the Law Case*

The Law Case was filed October 17, 1993. According to Mains's testimony at the hearing on the instant motions, at the time of filing, he had no information about Alper's relationship to PCS other than Alper's name being written on the relevant reports concerning Mrs. Cordova. He was unsure whether he had looked into any other address for Alper prior to filing suit. Mains testified that somebody in his office reached someone at PCS by

phone, but Mains was unable to recollect when this call took place or what the caller had learned. Mains further testified that he had looked for Physicians Clinical Services, Crawford, and Alper and that he had delayed service until he could find them. He stated that he attempted to get information from the Virginia State Corporation Commission and the corresponding agency in Pennsylvania but was unsuccessful. He further testified that someone from his office had looked in telephone directories but had not found any information.

Eventually, Mains called an attorney in Exton, Pennsylvania, who was listed with the American Trial Lawyers of America and inquired what that attorney knew about the PCS lab. The attorney told Mains that he would look into the matter and would call back. When the attorney called back, he advised that "it appeared that" the same people were still running PCS, but he believed it was under new ownership. No information was relayed concerning Alper. Based solely upon this attorney's phone call, Mains advised the Clerk of the Court on October 18, 1994, that Physicians Clinical Services no longer existed. See Plaintiff's Exhibit # 32. However, Mains still averred on January 16, 1995, in his affidavit pursuant to the Soldiers and Sailors Civil Relief Act, that Alper remained an agent or employee of Physicians Clinical Services and was therefore not a member of the Armed Forces. No evidence was presented of any attempts by any agent of Cordova to either corroborate the information related by the attorney in Pennsylvania or follow-up on any of the information provided. According to Mains, as of the date that judgment was entered against Alper and Crawford on August 12, 1996, he had no information about Alper that was not known when The Law Case was filed.

## C. Alper's Alleged Incompetency

By the mid-1980s, Carl Alper began to exhibit symptoms of mental difficulties. He would repeatedly ask his son Seth the same questions concerning Seth's career. He forgot to file income tax returns for multiple years and allowed insurance polices to lapse, even though he had ably taken care of his family's finances in the past. He agreed to accept employment with the Children's Hospital of Philadelphia in December of 1988 as an investigator in a study, but had to resign within three months. See Plaintiff's Exhibits # 9 and 10. However, a neurologic evaluation conducted in September of 1988 found "no real evidence of dementia" and a superior performance for a sixty-eight year old man. See Defendant's Exhibit # 23.

By the late 1980s, his daughter Naomi noted that Alper was both losing intellectual capacity and driving on curbs. Seth Alper recalled that his father

would repeatedly ask the same questions about the family's history. In addition, at times, Alper would get up in the middle of the night, be unable to find the bathroom, and would need assistance to locate it. By 1990, according to Seth Alper, his father would read the newspaper, but could not relate its contents to him thereafter. On some occasions, Alper would go out for a walk and get lost, and, on other occasions, he would wander away from the house, and the family would have to go search for him. Once, he wandered eight blocks away into a store and was unable to identify himself to the store owner.

In August of 1991, Alper was evaluated by various psychiatrists and neuropsychiatrists at the University of Pennsylvania. Dr. Raquel E. Gur found that Alper's "judgment is impaired and he cannot execute routine activities. He has difficulties following conversations and is forgetful and repetitive." See Plaintiff's Exhibit # 5, p. 1. Dr. Gur suggested that Alper then suffered from an onset of Senile Dementia-Alzheimer's Type. Dr. Barbara Watson, a Clinical Psychologist, noted that Alper's conceptual skills were impaired and found that his demonstrated deficits were "most consistent with a diagnosis of Alzheimer's Disease." See Plaintiff's Exhibit # 4, p. 5. A follow-up evaluation in March of 1992 noted further progressive declines. See Plaintiff's Exhibit # 7. In addition, the attorney hired by Naomi Alper to do estate planning for her parents in 1992 commented that "Carl suffers from the initial symptoms of a dementia of the Alzheimer's type." See Plaintiff's Exhibit # 19, p. 1. It does not appear, however, that his family believed Alper was fully mentally incompetent at that time, as they presented him with, and he executed, a Power of Attorney in favor of his wife Freda Alper in 1992. See Plaintiff's Exhibit # 18. By July of 1995, Alper's dementia had become "somewhat more severe," and he was attending day care five days a week when his wife was at work. See Defendant's Exhibit # 8(f). In May of 1996, however, the estate planning attorney who had been working with Naomi and Freda Alper forwarded to Mrs. Alper drafts of revised wills for Alper and her. No evidence was presented whether Alper ever executed this draft.

Alper began going to adult day-care in the early 1990s, initially three days per week and then more. He experienced increased difficulty conversing and asked repetitious questions. From 1995 to 1997, Alper did not speak at all on the telephone. When Naomi Alper found out about the judgment in The Law Case at the very end of 1996 or early 1997, she did not tell Alper about it because she did not believe he would understand. He lived in his house in Haddon Heights, New Jersey, until 2000, when he initially moved into an assisted living facility and then into a nursing care facility. He has subsequently passed away.

D. *Alper's Relationship with PCS*

In the mid-1980s, James L. Flore decided to open a medical laboratory in Pennsylvania and solicited David G. Wittenberg, Jacques B. Ferber, and Michael Barrist to join him in the endeavor. Flore also recruited Alper because of his expertise and reputation. See Deposition of Bradley Rainer, p. 51. A decision was made to establish a limited partnership to run the laboratory with a separate corporation as its general partner. On June 18, 1986, Flore, Wittenberg, Ferber, Barrist, and Alper entered into a Pre-incorporation Agreement for a corporation to be formed under Delaware law which would serve as the general partner of the limited partnership. See Plaintiff's Exhibit # 115. Pursuant to the Pre-incorporation Agreement, Flore either subscribed for or had control over approximately sixty percent of the shares of the corporation. Wittenberg, Ferber, and Barrist each subscribed for between eleven and fourteen percent of the shares, and Alper subscribed for approximately five percent of the shares. Each share was to cost ten cents. In addition, the parties pledged to make loans to the corporation, if necessary, in amounts ranging from $2,000.00 for Alper to $20,400.00 for Flore. Each party was to become an officer and director of the corporation, with Alper being designated as Vice President – Scientific Affairs. Flore and Alper were to become full-time employees of the corporation with the level of compensation to be determined by the Board of Directors. On July 3, 1986, Physicians Clinical Services, Ltd., was incorporated in the State of Delaware. See Plaintiff's Exhibit # 101. On September 17, 1986, Physicians Clinical Services Limited Partnership was organized as a Delaware limited partnership. See Plaintiff's Exhibit # 109, p. 11. Physicians Clinical Services, Ltd., was the LP's initial general partner and Flore was the initial limited partner. Alper was never a partner in the limited partnership. See Rainer Deposition, p. 21. In 1987, PCS did a public offering of interests in the limited partnership. Some interests were purchased by Virginia residents,[4] but the timing of those purchases was not established at trial. The LP's prospectus, dated August 8, 1987,[5] listed Alper as an officer, director, and shareholder of the limited partnership's general partner and noted that he would be the Laboratory Director of the Partnership. See Plaintiff's Exhibit # 109, p. 15.

---

[4] See Plaintiff's Exhibit # 111, Rainer Deposition, p. 33.
[5] See Plaintiff's Exhibit # 109.

Previously, on January 6, 1987, Alper had executed an employment contract with PCS[6] to be the director of the lab to be opened and operated in the future. Alper was to receive $35,000.00 yearly as compensation for his services, payable semi-monthly, when the income of the limited partnership exceeded its expenses in an amount sufficient to permit such payments. No evidence was adduced at trial whether Alper ever received any such compensation. On April 28, 1988, the limited partnership and Alper executed an Addendum to Employment Contract. See Plaintiff's Exhibit # 113. As PCS had not yet obtained a license to operate a laboratory, the Addendum called for the period of employment to begin when the laboratory commenced operations. Apparently, the laboratory opened in Exton, Pennsylvania, later in 1988. Although Alper was listed on PCS's April 1989 Laboratory Personnel Report to the State of Pennsylvania, he was not listed on the corresponding report in 1990. See Defendant's Exhibit # 12. On April 3, 1990, and April 17, 1990, Alper wrote to Flore resigning from the Board of Directors of PCS, Ltd., and accepted Flore's offer to repurchase Alper's shares in the corporation for ten cents a share payable "when cash flow allows." See Plaintiff's Exhibit # 28 and 29.

In 1991, PCS transferred its assets to Physicians Clinical Services, Ltd., which then transferred the assets to a new entity known as Clinical Laboratory Associates, Partnership ("CLAP"). Physicians Clinical Services, Ltd., owned 49% of this new Delaware partnership and Total Care Clinical Laboratories, Inc., owned the other 51%. CLAP continued to operate the laboratory at 825 Springdale Road, Exton, Pennsylvania, until May of 1994 under a trade name of Physicians Clinical Services, which was displayed in large letters on the side of the building housing the facility. See Rainer Deposition, pp. 36-37. In May of 1994, MEDLAB, Inc., purchased the laboratory and its assets from CLAP. MEDLAB continued to operate the laboratory for several months thereafter, but before the end of 1994, the laboratory in Exton, Pennsylvania, ceased operations. MEDLAB, Inc., went into bankruptcy in 1997 or 1998. See Rainer Deposition, p. 48.

## II. *Analysis*

### A. *Cordova's Affirmative Defenses*

Cordova claims that certain affirmative defenses should preclude this court from granting Alper any relief. These defenses include *res judicata*, judicial estoppel, equitable estoppel, and laches. This court will address each defense

---

[6] See Plaintiff's Exhibit # 113.

independently.

## (1) *Res Judicata*

Cordova initially argues that the default judgment granted in The Law Case, *ex parte*, now precludes Alper's present motions in both The Law Case and The Chancery Case. He contends that this court should not undertake any inquiry into the jurisdictional questions raised by Alper because principles of *res judicata* and collateral estoppel bar further consideration of the jurisdictional issues. The court disagrees.

The bar of *res judicata*, which encompasses, *inter alia*, the doctrine of collateral estoppel,[7] forbids relitigation of "a *valid* personal judgment on the merits" when the same parties or their privies were before the court at the time of the prior adjudication. *Bates v. Devers*, 214 Va. 667, 670-71, 202 S.E.2d 917, 920-21 (1974) (emphasis supplied). For *res judicata* to bar the prosecution of a second action, a judgment must have been rendered "by a court of competent jurisdiction in a judgment *in personam* in a former suit." *Ward v. Charlton*, 177 Va. 101, 115, 12 S.E.2d 791, 796 (1941) (quoting *United States v. California Bridge & Construction Co.*, 245 U.S. 337, 341, 62 L. Ed. 332, 38 S. Ct. 91, 93, 53 Ct. Cl. 620 (1917)). Consistent with an analysis under the Full Faith and Credit Clause of the Constitution, in order for a judgment to be *valid*, the original court must have had jurisdiction over both the parties and the subject matter. *Bloodworth v. Ellis*, 221 Va. 18, 21, 267 S.E.2d 96, 98 (1980) (citing *Nevada v. Hall*, 440 U.S. 410, 421, 59 L. Ed. 2d 416, 99 S. Ct. 1182 (1979)). Under the Full Faith and Credit Clause, unless the jurisdictional questions were litigated in the original court, "a court, when asked to give effect to the judgment of a court in another state, may inquire into that court's jurisdiction without offending the Full Faith and Credit Clause, 'notwithstanding the averments contained in the record of the judgment itself'." *Bloodworth*, 221 Va. at 21, 267 S.E.2d at 98 (quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 469, 21 L. Ed. 897 (1873)). The doctrine of *res judicata* is not constitutionally mandated but rather was judicially created to further public policies demanding an end to litigation and the prevention of harassment of parties. *Bates*, 214 Va. at 670, 202 S.E.2d at 920.

Cordova cites *Glumina Bank v. D. C. Diamond Corp.*, 259 Va. 312, 527

---

[7] The distinction between a plea of *res judicata* and a plea of collateral estoppel is not relevant here. In essence, *res judicata* bars the parties from relitigating not only issues actually determined in the first action but also issues that might have been determined, whereas collateral estoppel applies only to those issues actually litigated and determined previously. See *Simmons v. Commonwealth*, 252 Va. 118, 120, 475 S.E.2d 806, 807 (1996).

S.E.2d 775 (2000), in support of his position that principles of the judicially created doctrine of *res judicata* preclude this court from examining whether it had jurisdiction to enter the judgment in The Law Case. Cordova's reliance on the Supreme Court's decision in *Glumina Bank* is misplaced. No issue concerning *res judicata* was addressed or decided by the Court in that decision. In finding that a sufficient factual basis existed for the trial court to determine that it could exercise personal jurisdiction over the defendant, the Supreme Court stated:

> In this case, because the defendant was in default under our rules of procedure, the trial court properly could find the factual allegations of the motion for judgment accurate, as those allegations related to personal jurisdiction.

*Id.* at 317, 527 S.E.2d at 777 (emphasis supplied). Contrary to Cordova's position here, the Supreme Court ruled only that the trial court *could* find it had jurisdiction over the defendant, not that it *was required* to find it had jurisdiction over the defendant. Indeed, if an inquiry into jurisdiction after the entry of a default judgment is appropriate under the Full Faith and Credit Clause of the Federal Constitution, it would defy both precedent and logic to conclude that such an inquiry is forbidden based upon the judicially created doctrine of *res judicata*. The court therefore rejects Cordova's *res judicata* argument.

## (2) *Judicial Estoppel*

Next, Cordova asserts that Alper is judicially estopped from challenging the validity of the judgment in The Law Case by way of post-trial motions in that case. He argues that when The Chancery Case was filed, Alper affirmatively alleged that he had no adequate remedy at law and that the subsequent filing of the pending motion in The Law Case was thereby barred. Again, the court disagrees.

The doctrine of judicial estoppel is intended to "protect the integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment'." *New Hampshire v. Maine*, 532 U.S. 742, 749-50, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2001) (internal citations omitted). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel 'is an equitable doctrine invoked by a court in its discretion'." *Id.* (emphasis supplied).

Among the factors that should inform a trial court's decision whether to

apply the doctrine in a given case is whether a party has succeeded in convincing a court of the *bona fides* of its original position, such that "judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'." *Id.* at 750 (internal citations omitted). Indeed, absent success arguing the original position, the introduction of a later inconsistent position presents only a slight risk of inconsistent judicial determinations and poses little threat to the integrity of the judicial process. *Id.* Another factor to be weighed in deciding whether to invoke the doctrine is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 752. Consistent with other doctrines of estoppel, a party should not be allowed to mislead another party to that party's detriment.

Virginia courts have long recognized that a party may be "forbidden to assume successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other or mutually contradictory." *Leech v. Beasley*, 203 Va. 955, 961, 128 S.E.2d 293 (1962); *Burch v. Grace St. Bldg. Corp.*, 168 Va. 329, 340, 191 S.E. 672, 677 (1937); *Canada v. C. H. Beasley & Bro.'s*, 132 Va. 166, 111 S.E. 251 (1922); see also *Chesapeake & Ohio Ry. v. Rison*, 99 Va. 18, 37 S.E. 320. Stated another way, "[a] man shall not be allowed to approbate and reprobate at the same time." *Beasley*, 203 Va. at 962, 128 S.E.2d at 298.

Establishing judicial estoppel requires the moving party to prove by "clear precise and unequivocal evidence that it should be invoked." *Richfood v. Ragsdale*, 26 Va. App. 21, 24, 492 S.E.2d 836, 837 (1997). The elements necessary to succeed on such a claim include that: "(1) the inconsistent position first asserted must have been successfully maintained; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and questions must be the same; (5) the party claiming estoppel must have been misled and have changed his position; and (6) it must appear unjust to one party to permit the other to change." *Id.*

Recently in *Hoar v. Great Eastern Resort Mgmt.*, 256 Va. 374, 506 S.E.2d 777 (1998), the Supreme Court of Virginia addressed the interplay between the doctrine of judicial estoppel and Subsection (k) of Rule 1:4 of Rules of Virginia Supreme Court, which was added to Rule 1:4 in 1977. The Rule reads as follows:

> A party asserting either a claim, counterclaim, cross-claim, or third-party claim or a defense *may plead alternative facts and theories of recovery* against alternative parties, provided that such claims, defenses, or demands for relief so joined arise out of the

same transaction or occurrence. When two or more statements are
made in the alternative and one of them if made independently
would be sufficient, the pleading is not made insufficient by the
insufficiency of one or more of the alternative statements. *A party
may also state as many separate claims* or defenses *as he has
regardless of consistency* and whether based on legal or equitable
grounds.

Va. Sup. Ct. R. 1:4(k) (emphasis supplied). In *Hoar,* plaintiff sought to
prove that defendant, which ran Massanutten Ski Resort, had improperly
failed to warn of a dangerous condition on its ski slopes. At trial, plaintiff
attempted to introduce expert testimony that a warning sign was necessary
in the area where plaintiff was injured, but an objection to the testimony was
sustained by the court. Thereafter in the trial court, and on appeal, plaintiff
took the position that expert testimony was not necessary to establish the
applicable standard of care and that the jurors were fully able to determine
whether the failure to provide a warning constituted negligence on the part
of the defendant.

On appeal, the ski resort contended that plaintiff was judicially estopped
from assuming a position inconsistent with her initial position in the trial
court that expert testimony was appropriate to establish the applicable
standard of care. The Supreme Court disagreed. Relying on Rule 1:4(k), the
Court ruled that a litigant was entitled to state multiple claims "regardless of
consistency." *Hoar,* 256 Va. at 382, 506 S.E.2d 782. It recognized that "it is
not unusual in the trial of a case for a litigant to find himself blocked in an
effort to establish a point in a certain manner and then have to resort to a
different approach to make the point." *Id.* The Supreme Court reversed the
trial court and reinstated a jury verdict in favor of the plaintiff, ruling that a
litigant could embrace alternative legal theories despite their apparent
inconsistencies.

In creating Rule 1:4(k), the Virginia Supreme Court did not intend to
sanction a party's ability to play "fast and loose" with the state's judicial
system. *New Hampshire,* 532 U.S. at 750; see also *Stretch v. Watson,* 6 N.J.
Super. 456, 469, 69 A.2d 596, 603 (1949). Rather, it established a means of
balancing a court's need for integrity with a party's ability to present every
proper legal theory available to defend its claim. See *Church v.
Commonwealth,* 48 Va. Cir. 376, 380 (City of Richmond 1999) (to require a
plaintiff to "make an 'all or nothing' election ... is not just and is expressly
not required by Rule 1:4(k)").

Here, Alper filed The Chancery Case on April 19, 2001, seeking relief
under Va. Code § 8:01-428(D). Thereafter, on July 2, 2002, Alper filed a

Motion to Set Aside the Default Judgment in The Law Case. On August 16, 2002, the cases were consolidated for trial. Cordova argues that Alper is judicially estopped from seeking relief in The Law Case, based upon his initial pleading in The Chancery Case which asserted that he had no potential avenue for relief outside of an equitable claim under Va. Code § 8.01-428(D).

In a November 13, 2003, letter to the court, Cordova cited three cases in support of his position that Alper is estopped from filing a motion alleging lack of jurisdiction in The Law Case: *Sun Co. v. Burruss*, 139 Va. 279, 123 S.E. 347 (1924); *Bell-Ray Co. v. Chemrite (PTY) Ltd.*, 181 F.3d 435 (3d Cir. 1999); and *Insurance Corp. of Ireland v. Compagnie Des Bauxites*, 456 U.S. 694, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982). Each of these cases is inapposite as each opinion deals with a party's waiver of any jurisdictional claims following a general appearance. As no claim is made that Alper has entered a general appearance in The Law Case at any time, these cases do not support Cordova's estoppel argument.

To properly analyze Cordova's judicial estoppel defense, this court must first examine the initial position assumed by Alper. In this case, the court never ruled on the merits of Alper's § 8.01-428(D) claim prior to the filing of the motion to set aside in The Law Case; in fact, the court never even conducted a hearing on the issue. Instead, Alper merely devised an independent theory supporting his position while The Chancery Case remained dormant. Taking this context into account, it becomes apparent that Alper had no intention of undermining the integrity of this court by adopting a contradictory position in response to a particular ruling. Rather, after further contemplating the issue, Alper adopted an alternative theory meant to afford him the widest range of possible relief. Cordova does not argue that he has changed his position in reliance on Alper's initial decision to seek relief solely under § 8.01-428(D), nor was any evidence presented at trial that Cordova has been prejudiced, in any way, by Alper's decision to present two alternative theories supporting his request for relief from the default judgment.

The doctrine of judicial estoppel is intended to prevent parties from playing "fast and loose" with the courts and opposing parties. Its goal is to promote justice. Here, there is no basis to conclude that Alper, or his counsel, has engaged in any improper or inequitable conduct. Consequently, the court denies the affirmative defense of judicial estoppel.

### (3) *Equitable Estoppel*

Cordova next asserts that Alper is precluded from attacking the judgment

in question as void over four years after the fact, pursuant to the doctrine of equitable estoppel. Cordova specifically relies on Restatement (Second) of Judgments § 66. This section provides that:

> Relief from a default judgment on the ground that the judgment is invalid will be denied if:
>
> (1) The party seeking relief, after having had actual notice of the judgment, manifested intention to treat the judgment as valid; and
>
> (2) Granting the relief would impair another person's substantial interest of reliance on the judgment.

In Virginia, equitable estoppel claims typically require (1) a representation of either word or deed; (2) reliance; (3) a change of position; and (4) detriment.[8] *Waynesboro Village, L.L.C. v. BMC Properties*, 255 Va. 75, 82, 496 S.E.2d 64, 68 (1998); *Luddeke v. Amana*, 239 Va. 203, 387 S.E.2d 502 (1990); *Cowen v. Psychiatric Assoc.*, 239 Va. 59, 387 S.E.2d 747 (1990); *Fitzgerald v. Fitzgerald*, 194 Va. 925, 76 S.E.2d 204 (1953). "The party who relies upon estoppel must prove each element by clear, precise, and unequivocal evidence." *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust*, 243 Va. 53, 59, 413 S.E.2d 599, 603 (1992). Moreover, "because the doctrine of estoppel prevents the showing of the truth, it is applied rarely and only from necessity." *Id.*; *Hyson v. Dodge*, 198 Va. 792, 795, 96 S.E.2d 792, 795 (1957).

Equitable estoppel in Virginia thus mandates that "the person to be estopped has misled another to his prejudice or that the innocent party *acted in reliance* upon the conduct or misstatement by the person to be estopped." *Waynesboro Village*, 255 Va. at 82, 496 S.E.2d at 68 (emphasis supplied). In this matter, Alper made no affirmative misrepresentation relied upon by Cordova. Rather, Cordova hinges this affirmative defense on Alper's inaction. However, absent a legal or equitable duty to take action, "silence is not a manifestation of assent. It is not enough that the person against whom the judgment was rendered simply failed to take action to attack the judgment or to protest the fact that it had been rendered." Restatement (Second) of Judgments, § 66, cmt. b; see also *Whiting v. Whiting*, 32 Va. App. 192, 526 S.E.2d 806 (2000), rev'd on other grounds, 262 Va. 3 (2001) (applying equitable estoppel when husband accepted benefits from divorce decree he later challenged, after standing idly by knowing that his wife would eventually lose benefits if he delayed challenging the validity of the

---

[8] The only exception is a claim involving a statute of limitations defense, which includes the additional requirement of intent. See *Boykins Narrow Fabrics Corp. v. Weldon Roofing*, 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980). That is inapplicable in this matter.

decree).

There is no evidence that Alper accepted any benefits from Cordova or any other person as a result of the status of The Law Case during the period between the entry of judgment against Alper and the filing of the instant motions, or that he misled Cordova to his detriment. Cordova has failed to prove by clear and convincing evidence the requisite elements of his equitable estoppel defense. As such, there is no basis for Cordova to invoke the defense of equitable estoppel.

### (4) *Laches*

In his final affirmative defense, Cordova contends that Alper's claim in The Chancery Case is barred by the equitable doctrine of laches. He asserts that, if Alper himself did not know of the existence of the judgment in The Law Case, members of Alper's family knew of it in December of 1996 or January of 1997. Nevertheless, he argues, The Chancery Case was not brought until April 19, 2001.

Alper responds that (1) neither he, nor anyone he authorized to act on his behalf, had knowledge of the existence of the judgment until shortly before The Chancery Case was filed; (2) any inaction on the part of his son or daughter cannot be imputed to him; (3) a mere lapse of time is insufficient to support a claim of laches; and (4) Cordova has not satisfied his burden of proof to establish that he has been injured as a result of reliance on any alleged inaction.

Laches is "the neglect or failure to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party." *Stewart v. Lady,* 251 Va. 106, 114, 465 S.E.2d 782, 786 (1996) (quoting *Princess Anne Hills v. Susan Constant Real Est.,* 243 Va. 53, 58, 413 S.E.2d 599, 602 (1992)); *Masterson v. Board of Zoning Appeals,* 233 Va. 37, 47, 353 S.E.2d 727, 735 (1987). The burden of proving laches rests on the party who asserts it. *Princess Anne Hills,* 243 Va. at 58, 413 S.E.2d at 602; *Morris v. Mosby,* 227 Va. 517, 521-22, 317 S.E.2d 493, 496 (1984). "No rigid rule can be laid down as to what delay will constitute laches; every suit must depend upon its own circumstances." *Puckett v. Jessee,* 195 Va. 919, 930, 81 S.E.2d 425, 431 (1954). Hence, whether a finding of laches is appropriate rests within the discretion of the chancellor. *Stewart,* 251 Va. at 114, 465 S.E.2d at 786; *Masterson,* 233 Va. at 48, 353 S.E.2d at 735.

Relying on language from the Virginia Supreme Court's decision in *Milligan v. Milligan,* 145 Va. 184, 190, 133 S.E. 672 (1926), Cordova posits

that, in order to set aside the judgment, Alper must show that he was not guilty of laches. Assuming, without deciding, that the portion of the *Milligan* decision relied upon by Cordova is still good law, in light of the placement of the burden of proof in more recent laches cases decided by our Supreme Court, the evidence at trial established that Alper, himself, could not have been guilty of laches for two reasons. First, there is no evidence that Alper ever learned about the judgment in The Law Case. Second, for the reasons set out in Part IV of this letter opinion, Alper was suffering from severe dementia at all times after the entry of the underlying judgment. "Laches implies knowledge or means of knowing one's rights. . . ." *Counts v. Counts*, 161 Va. 768, 778, 172 S.E. 248, 251 (1934). A person of unsound mind, therefore, cannot be guilty of laches. *Id.*

In seeming recognition of this longstanding Virginia authority, Cordova asserts that members of Alper's family were guilty of laches and that their inaction should be imputed to him. Specifically, Cordova claims on brief that "the Alper family"[9] learned of the judgment in January of 1997, sought legal advice, but took no judicial action until April of 2001. Further, Cordova claims that "they were acting pursuant to a power of attorney executed by Carl Alper in 1992." *Id.* Finally, Cordova contends that representatives of Scottsdale Insurance Company "which had issued a liability policy to the laboratory of which Alper was the director, [and] had knowledge of the judgment at least as early as March of 1997" (*id.*) also took no action. Cordova claims that Scottsdale's inaction may therefore also be imputed to Alper.

This court finds that neither the facts nor the law support Cordova's position that Alper is guilty of laches through imputation of the inaction of others. The credible evidence presented at trial established that Alper's children, Seth and Naomi Alper, learned of the judgment in late 1996 or early 1997. It was only they who sought the advice of counsel. In contrast, Alper's wife Freda did not learn of the judgment until shortly before the filing of The Chancery Case, as her children had decided not to tell either of their elderly parents about it, for fear of its possible effect on their health. Alper's Power of Attorney was, however, executed *solely* in favor of his *wife* and not any of his children. As a result, there is simply no factual basis to support Cordova's contention that Alper is bound by the decision made by his children to shield him from knowledge of the Virginia judicial proceedings. Moreover, there is no factual basis to support Cordova's argument that the inaction of Scottsdale Insurance Company can be imputed to Alper. Although Scottsdale has been joined as a third-party defendant in

---

[9] See Trial Brief of Respondent Nester Cordova in The Chancery Case, p. 8.

The Chancery Case and is paying Alper's counsel, it is doing so under a reservation of rights. See Defendant's Exhibit # 14. The evidence presented at trial was insufficient to establish that Scottsdale insured Alper on Cordova's claim or had authority to act as his agent. In fact, no evidence was presented that any representative of Scottsdale spoke to either Alper, his wife, or an attorney hired by either, until shortly before the filing of The Chancery Case. All prior contact was with counsel for Crawford and attorneys consulted by Seth Alper, unbeknownst to either Alper or his wife Freda.

The applicable authorities further belie Cordova's laches by imputation argument. Cordova cites no case law supporting his theory that the inaction of Alper's children must be imputed to him, and Virginia law may support a contrary position. See e.g. *Irvine v. Greever*, 73 Va. (32 Gratt.) 411, 416 (1879) (declining to impute laches to wife and children of man whose creditors claimed interest in land husband held in fee, but which he should have held in trust for wife and children). Further, Virginia law is clear that laches "cannot be imputed to one of unsound mind." *Counts*, 161 Va. at 778, 172 S.E. at 251. As Alper was suffering from progressive dementia during the period of time that Cordova claims the defense of laches arose, the imputation theory must fail on that basis. Nor do the authorities cited by Cordova stand for the proposition that inaction of an insurer is imputable to a defendant on the issue of laches. Both *Adams v. Para-Chem Southern, Inc.*, 1998 NMCA 161, 126 N.M. 189, 967 P.2d 864, 866 (N. Mex. 1998), and Restatement, Judgments, Second, § 67(c), pertain to situations in which insurers failed to properly defend cases after an insured turned over responsibility for the defense to the insurer or its attorneys. The equitable defense of laches is discussed in neither the New Mexico case nor the Restatement section. On brief, Cordova relies on the same authorities and contends that the inaction of the attorneys consulted by Seth Alper must also be imputed to Alper. The analysis of the alleged inaction of those attorneys is no different than the analysis related to Scottsdale.

Additionally, Alper argues that Cordova has not established that he either relied upon or has been damaged by any alleged inaction of Alper. He contends that laches does not arise from a mere lapse of time. Alper correctly states the controlling Virginia law. "To constitute laches, there must be a delay that works a disadvantage to another." *Milligan*, 145 Va. at 188, 133 S.E.2d at 673. "Laches is the neglect to do something which a party ought to do, and mere lapse of time, unaccompanied by some circumstances affording evidence of a presumption that the right had been abandoned, is not 'laches'." *Kennedy Coal Corp. v. Buckhorn Coal Corp.*, 140 Va. 37, 58, 124 S.E.2d 482, 488 (1924).

Here, Cordova presented no evidence at trial that Alper, or anyone

operating on his behalf, either with or without Alper's authority, had abandoned any defenses to the judgment in The Law Case. Cordova's counsel did argue, however, that the lapse of time between the entry of the judgment and the filing of The Chancery Case had made it difficult for him to ascertain whether Alper had actually received notice of the pendency of The Law Case before judgment was entered. He further argued that had he known about Alper's claim at an earlier time, he could have resurrected the case against PCS within the six-month window of opportunity under Virginia's nonsuit statute. The court does not find that Cordova has satisfied his burden of proof on either of these contentions.

First, Cordova presented no evidence at trial that the progression of Alper's dementia between December of 1996 or January of 1997, when Alper's daughter first learned of the judgment, and April 19, 2001, when The Chancery Case was filed, had any effect on Cordova's ability to determine whether Alper had pre-judgment notice of the pendency of The Law Case. Cordova's contention that it might have had such an impact is premised solely on speculation. In fact, the evidence at trial and the record in The Law Case firmly supports the conclusion that Alper had no such notice of the proceedings.

Second, Cordova nonsuited his claim against Physician's Clinical Services on August 12, 1996. The six-month window to refile against that entity therefore expired on February 12, 1997. Cordova presented no evidence that Naomi Alper knew about the six-month window or that she had any legal duty to inform Cordova of the invalidity of the judgment in the less than two-month period from when she learned of it until the time the window of opportunity for refiling expired.

In addition, Cordova's counsel was advised by counsel for Crawford in January of 1997 that, at least as to Crawford, issues relating to the jurisdiction of the court and the validity of the judgment existed. Although this contact should have alerted Cordova that similar issues could exist as to Alper, no suit was brought on the nonsuited claim against Physicians Clinical Services within the remaining period before any such claim would be time-barred. In essence, on this issue, Cordova is arguing that the inaction of Alper's children during a brief period of time should preclude Alper from arguing that his right to due process was abridged, even though Cordova, himself, was lax in his prosecution of The Law Case from its inception. See *Emmett Puckett, Linzy Breeding, Trustees of the Spring City Primitive Baptist Church v. Jessee*, 195 Va. 919, 930, 81 S.E.2d 425, 430 (1954) ("Nothing can call forth [a] court into activity, but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing.") (internal citation omitted). Therefore, Cordova has failed to

meet his burden of proof on the elements of this defense. *Princess Anne Hills Civic League*, 243 Va. at 59, 413 S.E.2d at 603. The affirmative defense of laches is also rejected.

This court notes that its ultimate decision on the pending motions would be no different if the court accepted Cordova's laches defense because laches is an equitable defense only available against those asserting claims in equity not law. See *Finkel Outdoor Prods. v. Bell*, 205 Va. 927, 140 S.E.2d 695 (1965).

Ultimately, however, the court rejects each of Cordova's equitable defenses for an even more important reason; an acceptance of any of Cordova's equitable defenses would lead to an entirely unjust result. In The Law Case, as will be discussed fully, *infra*, a judgment for two million dollars was entered against a man who was not properly before this court, had no notice of the proceedings, and who was apparently not guilty of any fraud or negligence. To allow that judgment to stand based upon the invocation of an equitable defense would run contrary to virtually every principle of equity jurisprudence. Accordingly, this court rejects each of Cordova's affirmative defenses and will address Alper's arguments on their merits.

## B. *Issues Raised by Alper's Claims*

### (1) *Timeliness of Service of Process Issue*

Initially, Alper contends that he was not served with process within one year of the filing of The Law Case, and, pursuant to Va. Code § 8.01-275.1 and Rule 3:3 of the Rules of Virginia Supreme Court, the judgment against him is, therefore, invalid.

Virginia law is clear that "service of process in an action or suit within twelve months of commencement ... shall be timely as to that defendant. Service ... more than twelve months ... shall be timely upon a finding by the court that the plaintiff exercised due diligence to have timely service made on the defendant." Va. Code § 8.01-275.1. Put another way, "no judgment shall be entered against a defendant who was served with process more than one year after the commencement of the action against him unless the court finds as a fact that the plaintiff exercised due diligence to have timely service on him." Va. Sup. Ct. R. 3:3.

It is uncontested that Alper was purportedly served with process over one year after the filing of The Law Case. It is further undisputed that Judge Michael P. McWeeny entered an order on December 9, 1994, finding that Cordova had exercised due diligence in attempting to serve Alper, even

though service was not effected within a year. Alper argues that the evidence presented at the hearing on the instant motions establishes that due diligence was not exercised to serve him on a timely basis and that this matter must, therefore, be dismissed on that basis alone. Cordova responds that Judge McWeeny's finding is binding on this court. The court disagrees with both positions. First, the order of December 9, 1994, was entered in an *ex parte* hearing. In the event that this court was without jurisdiction to enter the order, Alper cannot be bound by the ruling. See *Bloodworth v. Ellis*, 221 Va. 18, 21, 267 S.E.2d 96, 98 (1980). Conversely, if Alper was properly before the court when the judgment order was entered against him on August 12, 1996, he cannot now re-open these proceedings to attack factual findings made during the course of the prosecution of The Law Case, as more than twenty-one days have elapsed since entry of the final order in the case. See Va. Sup. Ct. R. 1:1. As such, resolution of the *in personam* jurisdiction and service of process through the Secretary of the Commonwealth issues to be discussed *infra* will also be dispositive of this issue. Therefore, this court declines to set aside the judgment against Alper in The Law Case based solely upon an alleged failure to timely effect service of process on him.

(2) *In Personam Jurisdiction Issue*

It is axiomatic that a judgment rendered by a court that lacked *in personam* jurisdiction over a defendant is void. *O'Connell v. Bean*, 263 Va. 176, 179-80, 556 S.E.2d 741, 742 (2002); *Khatchi v. Landmark Rest. Assoc.*, 237 Va. 139, 142, 375 S.E.2d 743, 745 (1989). Cordova contends that this court properly exercised jurisdiction over Alper pursuant to Va. Code § 8.01-328.1, Virginia's long-arm statute. Virginia law is equally settled that the purpose of Virginia's long-arm statute "is to assert jurisdiction over non-residents who engage in some purposeful activity in this state to the extent permissible under the due process clause." *John G. Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971); see also *Peninsula Cruise v. New River Yacht Sales*, 257 Va. 315, 319, 512 S.E.2d 560, 562-63 (1999); *Krantz v. Air Line Pilots Assoc.*, 245 Va. 202, 205, 427 S.E.2d 326, 328 (1993); *Nan Ya Plastics Corp. v. DeSantis*, 237 Va. 255, 259, 377 S.E.2d 388, 391, cert. denied, 492 U.S. 921 (1989). Va. Code § 8.01-328.1 "is a single-act statute requiring only one transaction in Virginia to confer jurisdiction on our courts." *Nan Ya Plastics Corp.*, 237 Va. at 260, 377 S.E.2d at 391; *I.T. Sales, Inc. v. Dry*, 222 Va. 6, 9, 278 S.E.2d 789, 790 (1981). However, the reach of this statute is not without limits. In order for a non-resident to be subject to the jurisdiction of Virginia's courts, that person must have exercised certain "minimum

contacts" with Virginia, such that the maintenance of a suit here against that person would not offend "traditional notions of fair play and substantial justice." *Peninsula Cruise*, 257 Va. at 319, 512 S.E.2d at 562 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)); see also *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985); *Danville Plywood Corp. v. Plain and Fancy Kitchens, Inc.*, 218 Va. 533, 534-35 238 S.E.2d 800, 802 (1977).

Va. Code § 8.01-328.1(A) authorizes courts to exercise personal jurisdiction over persons who act directly or through an agent as to causes of action arising from nine separate categories of "contacts" with the Commonwealth of Virginia. However, Va. Code § 8.01-328.1(C) limits the breadth of the statute to encompass "only a cause of action arising from acts enumerated in this section. . ." when jurisdiction over a person is based solely upon this long-arm statute. Thus, a determination of the reach of Virginia's long-arm statute in a given case necessitates a two-prong analysis. First, a court must determine whether the language of the statute authorizes jurisdiction over the defendant in the given case. If so, the court must then consider whether the exercise of jurisdiction over the defendant would comport with the dictates of the Due Process clause of the Fourteenth Amendment to the United States Constitution. *Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993); *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990); *City of Virginia Beach v. Roanoke River Basin Assoc.*, 776 F.2d 484, 487 (4th Cir. 1985).

As a result, this court must initially decide whether Va. Code § 8.01-328.1 authorized service of process to be effected on Alper. It is unclear which of the nine subsections of 8.01-328.1(A) Cordova contends apply to Alper. Indeed, on the Affidavit for Service of Process on the Secretary of the Commonwealth, counsel for Cordova did not delineate the proposed ground(s) for service on a non-resident, notwithstanding the clearly stated requirement to do so and the admonition to the affiant to "comply with the appropriate requirements on the back of this form." See Plaintiff's Exhibit # 33. The only three sub-sections of 8.01-328.1(A) that could arguably apply to the circumstances of this case are the following:

1. Transacting any business in the Commonwealth;
2. Contracting to supply services or things in this Commonwealth; and. . . .
4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or

derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

Cordova all but concedes that none of these bases apply directly to Alper but argues that, as PCS would fall within the scope of the code section, Alper, a director and shareholder of the general partner of PCS, would also be covered by the section. The Virginia Supreme Court has not addressed this specific issue, but authorities from both within and outside Virginia convince this court that PCS's alleged contacts cannot be imputed to Alper individually.

The United States District Court for the Eastern District of Virginia and the Circuit Court of the City of Charlottesville have both directly addressed this issue. In *Miller & Rhoads v. West*, 442 F. Supp. 341 (E.D. Va. 1977), the plaintiff brought suit against officers and directors of a foreign corporation that had agreed to supply goods and management for plaintiff's stores in Virginia. Three individual defendants, the Chairman of the Board of Directors, the President, and the Treasurer of the foreign corporation, each of whom had been involved in the execution of the contract, were sued individually in the United States District Court in Virginia. None of them resided in or actually came to Virginia to transact business. Finding that the non-resident corporation never acted as an agent of any of the individuals, the District Court held that "the individual defendants are beyond the reach of the Virginia long-arm statute." *Id.* at 344.

Similarly, in *Sjolinder v. American Enterprise Solutions, Inc.*, 54 Va. Cir. 138 (City of Charlottesville, 2000), non-resident officers and directors of a corporation doing business in Virginia were sued in Virginia under Va. Code § 8.01-328.1, based upon alleged breaches of their fiduciary duties as directors of the corporation to other shareholders of the corporation. Relying principally upon the decisions in *Miller & Rhoads v. West* and *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052, 1064-65 (4th Cir. 1983), cert. denied, *Pearson v. Columbia Briargate Co.*, 465 U.S. 1007, 79 L. Ed. 2d 233, 104 S. Ct. 1001 (1984), Judge Edward L. Hogshire held that no basis was established to exercise *in personam* jurisdiction over the individual defendants based upon the corporation's amenability to suit in Virginia. See also *Firstcom Tech. Corp. v. Topologic Sys. Corp.*, 19 Va. Cir. 6 (Fairfax County, 1989) (holding that while acts of transacting business in Virginia may have been sufficient to subject corporation to defending suit in Virginia, individual directors and officers were not within the reach of Virginia's long-arm statute).

The United States Supreme Court has also recognized the distinction between a corporation and its agents when determining the sufficiency of

the contacts to establish a basis for a state to assert jurisdiction over an individual. In *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984), the Supreme Court addressed whether a reporter and editor working principally in Florida for a national tabloid could be sued in California for alleged defamatory statements included in an article that caused injury to an entertainer in California. The Court found that the intentional conduct of the individuals was calculated to cause injury in California and that jurisdiction was therefore properly asserted over them. However, the Court opined as follows:

> *Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there.* On the other hand, their status as employees does not somehow insulate them from jurisdiction. *Each defendant's contacts with the forum State must be assessed individually.*

*Id.* at 790 (emphasis supplied). The United States Court of Appeals for the Fourth Circuit adopted a similar view in *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052 (4th Cir. 1983). In that case, the Fourth Circuit held that a non-resident individual who commits a tort within the forum state is subject to suit in that state regardless of whether he was then acting in his "corporate or personal role." *Id.* at 1065. The Court, however, specifically noted that the result would have been different "had [the defendant's] connection with the tortious action been conducted *without* the forum state. . . ." *Id.* (emphasis supplied). The Court's articulation of the rationale underlying this distinction bears directly on this court's analysis in the instant case.

> After canvassing the reasoning of the various courts which have sought to provide a reasoned analysis of the question, we are persuaded that when a non-resident corporate agent is sued for a tort committed by him in his corporate capacity *in the forum state* in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process. On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and *if any connection he had with the commission of the tort occurred without the forum state*, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to

support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

*Id.* at 1064-65 (emphasis supplied).

The refusal of these courts to treat corporations and their officers, directors, shareholders, or employees as if they were one and the same is entirely consistent with Virginia's longstanding recognition that the independent existence of a corporate entity is a basic component of corporate law that should be disregarded only under extraordinary circumstances. See e.g., *Greenberg v. Commonwealth*, 255 Va. 594, 499 S.E.2d 266 (1998); *Bogese, Inc. v. State Highway Comm'r*, 250 Va. 226, 462 S.E.2d 345 (1995); *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318 (1993); *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828 (1987).

Here, Cordova does not allege that Alper committed any tortious act within Virginia. He alleges that Julieta Cordova's physician, Chun S. Lee, obtained and forwarded to PCS cervical smears from his patient[10] that were negligently read by PCS through its agents and employees, including Alper. See Plaintiff's Exhibit # 31, par. 9. He further alleges "upon information and belief that PCS acting through its agents and employees, including ... Alper ... knowingly substituted slides obtained from a healthy, normal individual and deliberately misidentified them as being slides obtained ... from Julieta Cordova, in an effort to hide the fact that the agents or employees of Defendant [PCS] had misdiagnosed the smears ... in an effort to defraud the plaintiff." See Plaintiff's Exhibit # 31, par. 13. No act or omission of Alper is alleged to have taken place within Virginia. Moreover, the credible evidence presented at the hearing on Alper's motions was clear and convincing that he had nothing to do with the analysis of any of the decedent's cervical smears or the alleged switching of the slides. His sole link to the matters that led to this litigation was the printing of his name along with Crawford's as Laboratory Director of PCS on the PCS report concerning the slide that was allegedly misread by "Fern Rosen CT (ASCP) Cytology Supervisor." See Defendant's Exhibit # 1.[11] His status as Director

---

[10] See Plaintiff's Exhibit # 31, par. 6.

[11] Although not an integral finding for its decision, the court notes that it disagrees with Cordova's assertion that Alper is vicariously liable for any negligence of Rosen. Other than being the titular co-director of PCS, no evidence establishes that Alper was at any time a principal for whom Fern Rosen was acting as an agent. Nor does Alper's status as an officer and minority shareholder of the general partner of PCS alter the analysis. Absent special circumstances, it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for the torts of its employees or agents. See *Meyer v.*

of the PCS lab and an officer and shareholder of Physicians Clinical Services, Ltd., are irrelevant as Dr. Lee had not heard of Alper before sending the relevant slide and did not rely upon Alper's name or reputation in deciding to send the slides to PCS. See Va. Code § 8.01-328.1(C) ("when jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him. . ."); see also *Chedid v. Boardwalk Regency Corp.*, 756 F. Supp. 941, 943 (E.D. Va. 1991) (interpreting "arising from" as requiring "a causal link between the acts relied on for personal jurisdiction and the cause of action asserted").

Further, Cordova does not allege, nor does the evidence support, any contention that Alper individually (1) transacted any business in this Commonwealth, (2) contracted to supply services or things in this Commonwealth, or (3) regularly did or solicited business, engaged in any persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in this Commonwealth. Thus, Alper does not fall within any cognizable scope of Va. Code § 8.01-328.1(A)(1), (2), or (4). As such, under the first prong of the applicable two-prong analysis, no basis existed for this court to exercise *in personam* jurisdiction over Alper at the time that Cordova obtained the judgment against him.

The analysis of the second prong yields the same conclusion. The Due Process Clause "does not contemplate that a state may make a binding judgment ... against an individual or corporate defendant with which the state has no contacts, ties or relations." *Shaffer v. Heitner*, 433 U.S. 186, 216, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977) (quoting *International Shoe Co. v. Washington*, 326 U.S. at 319). The touchstone of the constitutional inquiry remains whether a defendant "purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). The mere foreseeability of causing injury in another state is not a "sufficient benchmark" for that state to exercise personal jurisdiction. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). "Instead, 'the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there'." *Burger King Corp.*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp.* at 297). As the Supreme Court of Virginia aptly put it in its order affirming Judge Bach's ruling setting aside Cordova's judgment against Crawford, "a finding

---

*Holley*, 537 U.S. 280, 285-86, 154 L. Ed. 2d 753, 123 S. Ct. 824 (2003) (citing A. W. Fletcher, *Cyclopedia of the Law of Private Corporations*, 1137, pp. 300-01 (rev. ed. 1991-1994)).

of *in personam* jurisdiction in this case would require the appellee to defend himself in the courts of this Commonwealth simply because his type-written name appeared on three documents that were mailed to Virginia." *Cordova v. Crawford* (Record No. 127503, Mar. 23, 1999). Ultimately, the jurisdictional analysis is no different for Alper than it was for Crawford. Accordingly, this court holds that no proper basis existed for the Fairfax County Circuit Court to exercise *in personam* jurisdiction over Alper at the time that Cordova obtained the judgment against him in The Law Case.

## C. *Due Process Notice Issue*

Alper further contends that the judgment rendered against him in The Law Case is void because fundamental notions of due process were also violated in the manner in which process was purportedly served on him.[12] Cordova responds that service on the Secretary of the Commonwealth is specifically authorized pursuant to Va. Code § 8.01-329 when Virginia's long-arm statute affords a basis for a court to exercise *in personam* jurisdiction over a defendant. Here, according to Cordova, there is no question that process directed to Alper reached the Secretary of the Commonwealth and that the Secretary mailed it on November 10, 1994, to Alper at 825 Springdale Drive, Exton, Pennsylvania 19341. As a result, Cordova contends that service on Alper was "complete and conclusive." See *Basile v. American Filter Service, Inc.*, 231 Va. 34, 38, 340 S.E.2d 800, 802 (1986). Cordova's reliance on the Secretary's receipt and mailing of the process in this case is misplaced.

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 58 L. Ed. 1363, 34 S. Ct. 779 (1914). In the seminal case of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950), the United States Supreme Court recognized that the "right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.* at 314. The *Mullane* Court established the lodestar for determining the sufficiency of notice under the Due Process Clause. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is *notice reasonably calculated, under all the circumstances, to*

---

[12] Counsel for the parties have requested that this court address each of the arguments they presented at trial so that, if an appeal is noted to the Supreme Court, the potential for multiple appeals can be avoided if the Supreme Court were to find that this court erred in its initial basis for setting aside the default judgment. Counsel have been advised that their request would be honored.

*apprise interested parties of the pendency of the action* and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314 (emphasis supplied); see also *Greene v. Lindsey,* 456 U.S. 444, 72 L. Ed. 2d 249, 102 S. Ct. 1874 (1982) (finding posted service of summons on front door of residence pursuant to Kentucky statute unconstitutional, absent additional safeguards reasonably calculated to assure notice reaches defendant); *Dusenbery v. United States,* 534 U.S. 161, 151 L. Ed. 2d 597, 122 S. Ct. 694 (2002) (re-affirming that actual notice need not occur provided the method chosen to give notice was reasonably certain to inform those affected). And, "when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one *desirous of actually informing* the absentee might reasonably adopt to accomplish it." *Mullane,* at 315 (emphasis supplied). Determination of the sufficiency of notice in a given case involves analysis of the realities of that particular case. *Greene,* 456 U.S. at 451; *Virginia Lime Co. v. Craigsville Distributing Co.,* 670 F.2d 1366 (4th Cir. 1982).

Neither side cites any decisions of the Supreme Court of Virginia directly addressing Va. Code § 8.01-329 in the context of a due process analysis under *Mullane* and its progeny, and the court is unaware of any such decisions from Virginia's highest court. However, recent decisions of that Court help guide this court in its analysis of this issue. In apparent recognition of the principles of fundamental fairness underlying *Mullane* and its progeny, the Supreme Court of Virginia has on three separate occasions in the last fifteen years held that default judgments would be set aside because of the failure of the plaintiff to strictly comply with the dictates of Virginia statutes authorizing service through statutory agents. In *Khatchi v. Landmark Restaurant Assoc., Inc.,* 237 Va. 139, 375 S.E.2d 743 (1989), the Supreme Court affirmed the decision of a circuit court setting aside a default judgment based upon purported service on the Secretary of the Commonwealth. In *Khatchi,* the affidavit submitted by the plaintiff in furtherance of service on the Secretary had stated that "petitioner in this cause has been unable to obtain service against the above named defendant," whereas Code § 8.01-329 required that a plaintiff affirm "that after exercising due diligence, the party seeking service has been unable to locate the person to be served." The Supreme Court agreed that this deviation from the statutory language was fatal, reasoning that, "if a statute provides for constructive service, the terms authorizing it must be strictly followed or the service will be invalid and any default judgment based upon it will be void." *Id.* at 142, 375 S.E. at 745 (citations omitted).

The following year in *Dennis v. Jones,* 240 Va. 12, 393 S.E.2d 390 (1990), the Supreme Court addressed the validity of a default judgment based upon

116

service on the Commissioner of the D.M.V. Finding once again that the affidavit submitted by the plaintiff was insufficient, the Court reversed and, relying on its opinion in *Forrer v. Brown*, 221 Va. 1098, 1105, 277 S.E.2d 483, 486 (1981), opined that the purpose of statutory service "is to bring the defendant into court, to apprise the defendant of the nature of the proceedings, and to notify the party that his or her rights will be affected by the litigation." *Id.* at 1105, 399 S.E. at 486.

Most recently, in *O'Connell v. Bean*, 263 Va. 176, 556 S.E.2d 741 (2002), the Court overturned a default judgment based again on the plaintiff's failure to strictly comply with the affidavit requirements for service on the Secretary of the Commonwealth. Here, counsel for the plaintiff merely forgot to check a box in the Secretary's pre-printed affidavit form, incorporating the last known address of the defendant which was in fact set out in the caption of the same document. As neither the records from the Office of the Secretary nor the testimony at the hearing to set aside the judgment established that O'Connell had received actual notice of the malpractice claim against her, the Supreme Court found the judgment void. *Id.* at 179, 556 S.E.2d at 742.

Further, the fact that process may have been served on a statutory agent does not, of itself, provide sufficient notice of the pendency of proceedings to satisfy due process requirements. *Wuchter v. Pizzutti*, 276 U.S. 13, 72 L. Ed. 446, 48 S. Ct. 259 (1928). This mode of service must be supplemented by other written communication to the defendant "so as to make it reasonably probable that he will receive actual notice." *Id.* at 19. Va. Code § 8.01-329 contains a provision that is intended to satisfy this due process requirement:

> Such service shall be sufficient upon the person to be served, provided that notice of such service, a copy of the process or notice, and a copy of the affidavit are forthwith mailed by certified mail, return receipt requested, by the Secretary to the person or persons to be served at the *last known post-office address of such person*, and a certificate of compliance herewith by the Secretary or someone designated by him for that purpose and having knowledge of such compliance, shall be forthwith filed with the papers in the action.

Va. Code § 8.01-329(C) (emphasis supplied).

At the time that service was effected in this case, Code § 8.01-329 required only that the documents be mailed rather than forwarded by certified mail. Alper argues that this court should adopt the holding of the

Maryland Court of Appeals in *Miserandino v. Resort Properties, Inc.*, 345 Md. 43, 691 A.2d 208 (1997), that notice by first-class mail, rather than certified mail, under § 8.01-329 is constitutionally infirm. This court declines to rely on the four member majority opinion in *Miserandino* because (1) this court found the three-member dissent more persuasive and (2) this court does not believe that the decisions of the United States Supreme Court support the *Miserandino* majority's view that utilization of certified rather than first class mail is a necessary minimum threshold to comport with the due process requirement. ·See *Mullane*, 339 U.S. at 318 (holding that notice "at least by ordinary mail to the record addressee" is required to satisfy due process); *Greene*, 456 U.S. at 455 (holding that notice by mail to "the mailing address of the defendant," in addition to service by posting, satisfies due process).

The Supreme Court of Virginia has not had occasion to construe the phrase "last known post-office address of such person." However, the United States Court of Appeals for the Fourth Circuit has addressed the phrase in the context of a due process analysis. Recognizing that the construction of the phrase would necessarily have to comport with the notice requirements articulated by the United States Supreme Court in *Mullane*, the Fourth Circuit held that the requirement was satisfied "when process is sent to the address at which the parties regularly corresponded by mail, and the party serving process reasonably could expect that process would reach the defendant at that address." *Virginia Lime Co. v. Craigsville Distributing Co.*, 670 F.2d at 1368. This determination would have to be made on a case by case basis. *Id.* Although this court need not accept the construction enunciated by the Fourth Circuit in *Virginia Lime Company*, it is bound by the constitutional principles underlying it. Further, this court is required to interpret Va. Code § 8.01-329 "in such a manner as to avoid a constitutional question whenever this is possible." *Yamaha Motor Corp. v. Quillian*, 264 Va. 656, 665, 571 S.E.2d 122, 127 (2002) (quoting *Eaton v. Davis*, 176 Va. 330, 339, 10 S.E.2d 893, 897 (1940)). All acts of the General Assembly are presumed to be constitutional. *Virginia Soc'y for Human Life v. Caldwell*, 256 Va. 151, 156-57, 500 S.E.2d 814, 816 (1998); *Hess v. Snyder Hunt Corp.*, 240 Va. 49, 52, 392 S.E.2d 817, 820 (1990). As a result, courts should declare legislative enactments invalid only when the statute is "plainly repugnant to some provision of the state or federal constitution." *Blue Cross v. Commonwealth*, 221 Va. 349, 358, 269 S.E.2d 827, 832 (1980). Guided by the controlling constitutional and statutory construction principles, this court interprets the phrase "last known post office address of such person" as set out in Va. Code § 8.01-329, to mean the address at which a person would reasonably expect the addressee to actually receive mail, based upon all information then known

or reasonably available to the addressor. The sufficiency of Cordova's purported service of process on the Secretary of the Commonwealth as statutory agent for Alper must therefore be evaluated pursuant to this test.

On October 18, 1994, Cordova requested that service of process on Alper be effected by serving Virginia's Secretary of the Commonwealth. In the Affidavit for Service of Process on the Secretary of the Commonwealth, Mains averred that both Alper and Crawford were non-residents of Virginia and that the last known address for both was 825 Springdale Drive, Exton, Pennsylvania 19341. See Plaintiff's Exhibit # 33. The sole basis for making that assertion was the listing of Alper and Crawford's names as Laboratory Director on PCS's reports on Mrs. Cordova's slides, approximately five years earlier. In fact, neither Alper nor Crawford had received mail at that address for a number of years before that date and information reasonably available to Cordova could have established that fact. Indeed, when Mains appeared before the court on February 6, 1995, and obtained a finding of default against Alper and Crawford and again on June 7, 1996, when the default judgments were entered, a review of the court's file in The Law Case would have shown that the court's January 1995 mailings to Alper and Crawford at the address provided by Mains had been returned "Return to Sender – Moved, Left No Address." See *supra.*

This failure to take steps to uncover information that was reasonably available to Cordova and his counsel and which would have provided a basis to determine whether mailing a copy of the summons to Alper at 825 Springdale Drive, Exton, Pennsylvania, was "reasonably calculated to reach" Alper was entirely consistent with the almost complete lack of any real effort undertaken by Cordova and his agents to provide any notice to Alper of the pendency of The Law Case. If someone were truly interested in ascertaining whether Alper could be reached at that address, someone could have easily called or visited the premises at that address. Although Mains testified that his staff member called the PCS laboratory and spoke to someone, no evidence was presented as to whether the staff member even inquired about Alper's presence at the lab or his actual whereabouts. This court also does not find credible Mains's recollection that someone from his office looked in telephone directories to attempt to locate Alper and Crawford. From 1989 through 1996, Crawford lived in the same house in Chester County, Pennsylvania, where the PCS lab was located. According to Crawford's unchallenged testimony, his phone number at that address was listed in the phone directory throughout that period. Although Cordova claims that he was not able to determine another address for Crawford prior to judgment being entered on August 12, 1996, the evidence established that within only four months thereafter, actual notice of the judgment was

received by Crawford from attorneys in West Chester, Pennsylvania. Moreover, Alper's true post office address from 1954 until 2000 was 1126 S. Park Avenue, Haddon Heights, New Jersey, a community located just over ten miles from Philadelphia, Pennsylvania, and just over forty miles from Exton, Pennsylvania. On March 19, 1998, Mains's office requested that an investigator ascertain Alper's location. See Plaintiff's Exhibit # 71. No birth date or social security number was provided, but a potential prior residence in Cherry Hill, New Jersey, was noted. In less than one week, Mains's office was notified of the Haddon Heights, New Jersey, address for Alper. See Plaintiff's Exhibit # 44. This court does not rule that the retention of the services of a private investigator is always necessary before a party may provide a last known post office address. And, during all relevant years, a phone number for C. Alper was listed in the Bell Atlantic White Pages/Yellow Pages Camden County Area at that address.[13]

Mains also testified that he attempted to locate PCS, Crawford, and Alper through the Virginia State Corporation Commission (SCC) but was unsuccessful. Again, the documentary evidence submitted at the hearing is inconsistent with Mains's recollection. In fact, the records of the SCC reflect that Physicians Clinical Services, Ltd., obtained a Certificate of Authority to do business in Virginia on August 8, 1991. See Plaintiff's Exhibit # 101; PCS, Ltd. Partnership, was also registered with the SCC; see Plaintiff's Exhibit # 108. The application filed with the SCC noted that Physicians Clinical Services, Ltd., was a Delaware corporation. An inquiry to the Office of the Secretary of State of Delaware would have identified G. Bradley Rainer, Esquire, as the incorporator. See id. In addition, in his deposition, Rainer testified that the corporation's registered agent in Virginia had his name and transmitted documents to him. See Rainer deposition, p. 15. Rainer was the attorney for PCS, and he had Alper's correct home address. See Defendant's Exhibit ## 25, 26, 27. Moreover, he provided Crawford with contact information for Naomi Alper when Crawford was notified of the judgment in December of 1996. Cordova could have easily ascertained Alper's true post office address through Rainer, if Cordova had truly sought to give Alper notice of The Law Case before judgment was entered.

Finally, Mains testified that, sometime prior to October of 1994, he called an ATLA member in Exton, Pennsylvania, and inquired about PCS. According to Mains, that attorney later told him that it "appeared" the same people were running the lab but he "believed" it to be under new ownership.

---

[13]Counsel for the parties advised the court in a telephone conference call that they had no objection to the court's taking judicial notice of the distances between Haddon Heights, New Jersey, and Philadelphia and Exton, Pennsylvania, and the telephone directory listings forwarded by counsel for Alper as an exhibit to his Supplemental Trial Brief on Behalf of Carl Alper.

120

Cordova presented no evidence explaining the basis for either the appearance or the belief. Mains's testimony concerning his conversations with the unknown attorney made no mention of Alper. Therefore, this court has no reason to believe that Mains was provided any information from which he could have reasonably concluded that Carl Alper was then working at the PCS lab. Nonetheless, no effort was made to follow up on the information supplied by the attorney, either by way of a visit to the facility or a phone call inquiring about Carl Alper.

Notwithstanding the lack of any additional information supporting a good-faith basis to assert that Alper would receive mail at the PCS lab, Mains filed an affidavit for service of process through the Secretary of the Commonwealth on October 18, 1994, averring that Alper was a non-resident of the Commonwealth of Virginia with a last known post office address at the PCS lab in Exton, Pennsylvania. As Mains candidly admitted at the hearing, the information supplied in this affidavit was based upon the 1989 laboratory report bearing Alper's pre-printed name. Mains further acknowledged that he did not know whether Alper was in the Armed Forces when he submitted his January 1995 affidavit averring that he was not in the Armed Forces. He simply relied upon the meager information related to him by the ATLA attorney in Exton.

"When notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315. Indeed, under Virginia law, when an affidavit in support of constructive service of process is submitted, "the grounds so stated must, in fact, be true, and not merely idle declarations having no factual basis." *Dennis v. Jones*, 240 Va. at 18, 393 S.E.2d at 393. After full consideration of Mains's testimony at the hearing and the other evidence presented, this court is forced to conclude that the means employed to give notice to Alper of a two million dollar claim against him was intended merely to attempt to satisfy a perceived minimum threshold to effect service of process through the Secretary of the Commonwealth and was utterly lacking any true intent to inform Alper of the ongoing proceedings against him. On October 18, 1994, neither Cordova nor his counsel could reasonably have expected mail to be actually received by Alper at 825 Springdale Drive, Exton, Pennsylvania 19341, based upon all information then known or reasonably available to them. Therefore, the affidavit submitted by Mains listing that address as Alper's last known post office address failed to comport with the due process notice requirement this court has found to be an inherent part of Va. Code § 8.01-329. Consequently, this court quashes the service of process on Alper through the Secretary of the Commonwealth.

## D. *Effect of Alleged Legal Incompetency of Alper*

Alper next contends that, during the time frame from the filing of The Law Case until judgment was entered against him, he was a "mentally incapacitated person" (as now defined by Virginia Code § 37.1-134.6) and, as no guardian ad litem was appointed to represent his interests pursuant to Va. Code § 8.01-9, the judgment in The Law Case is void. The Virginia statutes cited by Alper on brief do not support his position.

Va. Code § 8.01-9 states in relevant part as follows:

> A. A suit wherein a person *under a disability* is a party defendant shall not be stayed because of such disability but the court in which the suit is pending, or the clerk thereof, shall appoint a discreet and competent attorney-at-law as guardian ad litem to such defendant, whether the defendant has been served with process or not.

*Id.* (emphasis supplied). "Person under a disability," is defined in the present version of Va. Code § 8.01-2(6), relied upon by Alper on brief, as including:

> a. a person convicted of a felony during the period he is confined;
> b. an infant;
> c. a drug addict or an alcoholic as defined in § 37.1-1;
> d. an incapacitated person as defined in § 37.1-134.6;
> e. an incapacitated ex-service person under § 37.1-134.20; or
> f. any other person who, upon motion to the court by any party to an action or suit or by any person in interest, is determined to be (i) incapable of taking proper care of his person, or (ii) incapable of properly handling and managing his estate, or (iii) otherwise unable to defend his property or legal rights either because of age or temporary or permanent impairment, whether physical, mental, or both.

Sub-sections (a), (b), (c), and (e) would clearly not apply to Alper. In addition, an incapacitated person under § 37.1-134.6 is defined as "an adult *who has been found by a court* to be incapable of receiving and evaluating information effectively. . . ." (Emphasis supplied.) Alper does not contend that any court had made such an adjudication prior to the judgment being

entered in The Law Case, and sub-section (d) therefore does not apply. Moreover, no contention is made that any pre-judgment motion was made in The Law Case to determine Alper's competency, and, therefore, sub-section (f) is equally inapplicable. Hence, the statutory scheme cited by Alper does not support his contention that the judgment against him is void.

Alper does not rely upon the version of § 8.01-2 in effect at the time that the judgment was entered against him in The Law Case. This court is aware that a "person under a disability" then included a "mentally ill" person as defined in § 37.1-1 and "a person of advanced age or impaired health under [former] § 37.1-132." See § 8.01-2, amended and reenacted by Acts 1997, c. 921, effective January 1, 1998. Although the prior statutory definition of "a person under a disability" would present a much closer factual case whether Alper fit within the statutory definition, this court's ultimate resolution of the voidable versus void judgment issue would be no different, at least, in part, because of the public policies articulated in this portion of the court's opinion letter.

Alper further argues that Rule 55 of the Federal Rules of Civil Procedure and the decision of the Supreme Court of Virginia in *Dunn v. Terry, Adm'x*, 216 Va. 234, 217 S.E.2d 849 (1975), support his mental incompetency contention. Alper's reliance on these authorities in support of an argument that the judgment is void is misplaced. First, Virginia has not adopted Rule 55 of the Federal Rules of Civil Procedure, and, therefore, that Rule is not binding in any way on this court. Second, the language from the Supreme Court's opinion in *Dunn v. Terry* relied upon by Alper is also not controlling authority. The issue in *Dunn* was whether an inmate in the Virginia penitentiary, who was already before the court in a civil wrongful death action before his conviction and incarceration, could waive his statutory right to the appointment of a committee when he was represented by counsel in the wrongful death case. The Supreme Court held that he could, but in *obiter dictum*, relied upon here by Alper, the Court stated that "we will assume, however, without deciding, that prior to the enactment of [former] Code § 8-88.1, appointment of either a committee or guardian ad litem for an insane defendant in Virginia was, as was the appointment of a guardian ad litem for an infant defendant, a jurisdictional rather than a procedural requirement." *Id.* at 239, 217 S.E. at 853-54. Indeed, the Supreme Court had held in *Kanter v. Holland*, 154 Va. 120, 152 S.E. 328 (1930), that a judgment rendered against an infant without benefit of a guardian ad litem was void. However, in *Taylor v. Taylor*, 159 Va. 338, 165 S.E. 414 (1932), a case involving an insane individual, the Supreme Court had opined as follows:

Nor is the mere fact that the defendant was insane at the time of the

granting of the judgment of itself sufficient to cause the judgment to be vacated. If a divorce is fairly procured on order of publication, it would be a dangerous doctrine, with capacity for untold injury, to say that years thereafter, the defendant could have the decree annulled simply by showing that at the time of the judgment he or she was insane, or confined in some penitentiary on a conviction of felony. The plaintiff in such case may have proceeded in the utmost good faith, and relying on a divorce procured in a way given him by the law, may have married again and had children. Equity could not penalize the innocent because of an error for which they were in no wise responsible. *A judgment so obtained against an insane person is not void, but voidable only*, and whether it may be afterwards vacated is a question to be determined in each case by a sound discretion under the guidance of established legal principles.

*Id.* at 343-44, 165 S.E. 415 (emphasis supplied); see also *Dunn*, 216 Va. at 239, 217 S.E.2d 853 (noting that other courts have held that statutes providing for appointment of a guardian ad litem to defend the interests of an insane person are procedural and not jurisdictional) (citations omitted).

The Virginia Court of Appeals has also distinguished between the classes of persons under a disability and held that they warrant differing treatment. In *Pigg v. Commonwealth*, 17 Va. App. 756, 441 S.E.2d 216 (1994), the Court, sitting *en banc*, held that a judgment rendered against an alcoholic whose interests were not protected by a guardian ad litem was merely voidable, not void. *Id.* at 762, 441 S.E.2d at 220. Relying upon the Supreme Court's decision in *Dunn*, the *Pigg* Court reasoned that an alcoholic, contrary to an infant, is not precluded from conducting business solely by virtue of the disability. *Id.* at 762, 441 S.E.2d at 220.

Public policy considerations also support a conclusion that a judgment entered against a "person under a disability" who is not an infant and whose interests were not protected by the appointment of a guardian ad litem, should be voidable, not void. As both the Supreme Court in *Dunn* and the Court of Appeals in *Pigg* have noted, non-infants who suffer from a statutory disability under § 8.01-2 are not necessarily legally incompetent and may potentially be able to appropriately protect their legal interests. If all such judgments were rendered void simply because a person fell within the ambit of § 8.01-2, persons, such as the defendants in *Dunn* and *Pigg*, who were fully able to understand the proceedings and protect their interests, could have just and proper judicial determinations set aside solely as a result of a legal disability of which neither the plaintiff nor the court had

any reason to be aware. And, as the Supreme Court recognized in *Taylor*, innocent parties, including strangers to the actual litigation, could suffer significant and unwarranted repercussions· as a result of a seemingly valid judgment being rendered void for reasons that could not have been discovered, notwithstanding the exercise of due diligence.

Virginia law has long recognized that a party may bring an independent action in equity to be relieved from the effects of a judgment that the law, in good conscience, should not enforce. The right to bring such an action is statutorily recognized in Va. Code § 8.01-428(D). That cause of action provides sufficient protection for those non-infants who fit within the statutory definition of a person under a disability, whose rights are truly prejudiced as a result of their disabilities. As such, it is neither necessary nor warranted to render all judgments entered in contravention of § 8.01-9 void as a matter of law. As a result, Alper's claim that he was mentally incompetent during all relevant periods in The Law Case will be analyzed under the rubric of Va. Code § 8.01-428(D), not § 8.01-9. Alper's claim that the judgment against him in The Law Case is void solely because a guardian ad litem was not appointed to represent his interests before the judgment was entered is therefore rejected.

### III. *The Chancery Case*

On April 19, 2001, Alper filed The Chancery Case seeking relief from the judgment entered in The Law Case. Although this court has ruled herein that Alper is entitled to relief in The Law Case, at the request of counsel for the parties, this court will, nonetheless, address the issues raised in The Chancery Case.

In Virginia, a court sitting in equity, has the inherent power to entertain an independent action to relieve a party of the effects of a judgment entered against that party. See *Gulfstream Building Associates v. Britt*, 239 Va. 178, 182, 387 S.E.2d 488, 490 (1990): *McEwen Lumber v. Lipscomb Bros. Lumber*, 234 Va. 243, 248-49, 360 S.E.2d 845, 848 (1987). That common law principle is now codified in Va. Code § 8.01-428(D) which reads:

> This section does not limit the power of the court to entertain at any time an independent action to relieve a party from any judgment or proceeding, or to grant relief to a defendant not served with process as provided in § 8.01-322, or to set aside a judgment or decree for ·fraud upon the court.

In order to assure that a high degree of finality attaches to all judgments, this

code section must be narrowly construed. *Byrum v. Lowe & Gordon, Ltd.*, 225 Va. 362, 365, 302 S.E.2d 46, 48, cert. denied, 464 U.S. 961 (1983). A party bringing such an action therefore has the burden of proof on each of the following elements of that cause of action:

> (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.

*Ryland, Executrix v. Manor Care, Inc.*, 266 Va. 503, 587 S.E.2d 515 (2003); *Media General v. Smith*, 260 Va. 287, 290, 534 S.E.2d 733 (2000); *Charles v. Precision Tune, Inc.*, 243 Va. 313, 317-18, 414 S.E.2d 831, 833 (1992). As a trial court is required to "articulate its findings with particularity regarding each of the five elements," the court will address them in order. See *Ryland, Executrix*, 266 Va. at 510, 587 S.E.2d at 519.

First, this court finds that the judgment against Alper in The Law Case ought not be enforced in good conscience. The evidence presented to this court establishes that Alper had no notice before judgment was entered that a two million dollar lawsuit had been filed against him. Moreover, the evidence is clear that he played no role in the alleged fraudulent handling of Mrs. Cordova's slides, which formed the basis for the judgment against him. Nor is there any evidence that he participated in the alleged misreading of the relevant slides, and the credible evidence presented at the trial in The Chancery Case belies any contention that he did.

Second, Alper had myriad valid defenses to the cause of action upon which the judgment was founded in addition to his complete lack of involvement in the alleged fraud. Other defenses included (1) lack of any negligence on the part of Alper; (2) expiration of the applicable statutes of limitations on at least the malpractice claim, if not both that claim and the fraud claim; and (3) the absence of causation as (i) no damages seemingly flowed from the alleged after-the-fact switching of the slides and (ii) Mrs. Cordova's cancer may well have been too advanced to successfully treat, especially in light of her decision to carry the baby to full term.

Third, there were multiple mistakes by Cordova which prevented Alper from obtaining the benefit of his defense. As discussed above, Cordova mistakenly believed that mailing notice of the pendency of The Law Case to Alper at the PCS lab would alert Alper that he needed to defend his interests.

The evidence is clear and convincing that no such notice ever reached Alper.

Moreover, the evidence is also clear and convincing that Alper was throughout the entire time frame from the time of the purported service of process on him by way of the Secretary of the Commonwealth on November 18, 1994, through the entry of judgment against him on August 12, 1996, a person who was "(i) incapable of taking proper care of his person, or (ii) incapable of properly handling and managing his estate, or (iii) otherwise unable to defend his property or legal rights either because of age or temporary or permanent impairment, whether physical, mental, or both." Va. Code § 8.01-2. He was then suffering from dementia related to Alzheimer's disease according to a number of treating health care professionals. He had neglected to file tax returns for a number of years and had allowed important insurance policies to lapse even though he had always been in charge of his family's finances. He was dealing with the effects of short-term and long-term memory loss, as evidenced by an episode when he wandered away from his home into a store eight blocks away and was unable to identify himself to the store owner. He experienced increased difficulty conversing and by 1995 was no longer speaking on the telephone. From the early 1990s on, Alper required adult day care initially three days per week and later five days per week when his wife was away at work.

The unmistakable conclusion from the evidence presented at trial was that Alper suffered from ever-increasing symptoms of dementia as a result of the progression of his Alzheimer's disease, and, by 1994, was unable to defend his legal rights. If this information had been known by either Mains or the court, there is no question that an appropriate motion would have been brought before the judgment was entered in The Law Case and Alper clearly would then have qualified as a "person under a disability," pursuant to Va. Code § 8.01-2(6)(f). But for the mistaken belief that Alper suffered from no such disability, a guardian ad litem would have been appointed under Va. Code § 8.01-9 to defend Alper's interests in The Law Case, and he would have been able to present his defenses to the court.

Fourth, although Cordova claims that members of Alper's family were at fault or negligent in failing to seek relief from the judgment at an earlier time, no allegation has been made that Alper was at fault or negligent during the relevant period of time from the filing of The Law Case until the entry of the judgment against him. See *Ryland*, 266 Va. at 511, 587 S.E.2d at 520 (examining fault/negligence issue in context of why Manor Care had not responded to the motion for judgment); *Media General*, 260 Va. at 291, 534 S.E.2d at 735 (assessing why Media General did not respond to Smith's motion for judgment). To the contrary, the evidence adduced at the trial in The Chancery Case established that Alper neither knew, nor had any reason

to know, about the pendency of The Law Case.

Finally, for the reasons set out in Part II of this letter opinion, the court finds that Alper has an adequate remedy at law, to wit, having the default judgment in The Law Case set aside for lack of *in personam* jurisdiction and the failure to effect proper service of process. But for the existence of this remedy, this court would have held that The Chancery Case was a classic example of when the cause of action recognized in Va. Code § 8.01-428(D) should be applied. However, as Alper has an adequate remedy at law, this court necessarily finds that Alper has not met his burden of proof on all five enumerated elements of this cause of action. See *Media General*, 260 Va. 287, 534 S.E.2d 733. Accordingly, The Chancery Case must be dismissed.

## IV. *Conclusion*

For the reasons set forth above, this court finds: (1) that Cordova has failed to satisfy his burden of proof on any of his affirmative defenses; (2) that the court was without *in personam* jurisdiction over Alper in The Law Case; (3) that Alper was not properly served with process in The Law Case; (4) that the Motion to Set Aside Default Judgment filed in The Law Case should be granted; (5) that Alper has an adequate remedy at law, and, therefore, has not satisfied his burden of proof on each element of a cause of action under Va. Code § 8.01-428(D). Accordingly, the Motion to Set Aside Default Judgment in Law Number 127502 is granted and the judgment in that case is vacated, and Chancery Number 172027 is dismissed.